IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 16, 2011 Session

## STATE OF TENNESSEE v. JEREMY KEETON

**Direct Appeal from the Circuit Court for Wayne County**
**No. 14050    Stella Hargrove, Judge**

---

**No. M2012-02536-CCA-RM-CD - Filed April 16, 2013**

---

This case was remanded by the Tennessee Supreme Court for reconsideration after ordering that the record be supplemented with a statement of evidence regarding a missing portion of the trial transcript. *See* Tenn. R. App. P. 24(c). A Wayne County jury convicted the Defendant, Jeremy Keeton, of manufacturing marijuana by growing or cultivating not less than 100 nor more than 499 marijuana plants, and the trial court sentenced him to twelve years in the Tennessee Department of Correction. On appeal, the Defendant contends: (1) that he is being denied an "effective appeal" because the record on appeal does not include an official transcript of his cross-examination of a material prosecution witness; (2) the trial court erred when it denied his motion to suppress; (3) the evidence is insufficient to sustain his conviction; and (4) the trial court erred when it sentenced him by not considering a relevant mitigating factor. After a thorough review of the record and applicable authorities, we conclude there exists no reversible error in the judgment of the trial court. We, therefore, affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DONALD HARRIS, SR. J., joined.

William M. Harris (on appeal), Lawrenceburg, Tennessee and J. Daniel Freemon (at trial), Lawrenceburg, Tennessee for the appellant, Jeremy Keeton.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; T. Michel Bottoms, District Attorney General, and Douglas Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

1

# OPINION

## I. Facts

This case arises from the Defendant's growth and maintenance of marijuana plants near his residence. For growing these plants, the Defendant was indicted on charges of manufacturing marijuana by growing or cultivating more than 500 marijuana plants, a Class A felony. *See* T.C.A. §39-17-417(j)(13)(A) (2010). At the Defendant's trial on these charges, the following evidence was presented:

Van Samuel Lafevers testified and described the Defendant as his friend of many years and said the two lived within a mile of each other. He said that the Defendant asked him to help him water a marijuana patch. The two had gone together on two or three occasions to a marijuana patch that Lafevers believed belonged to the Defendant. The two rode on the Defendant's four-wheelers or in the Defendant's vehicle to get to the marijuana patch, which was in close proximity to the Defendant's house. The patch was planted among pine trees and surrounded by a wire that Lafevers had given to the Defendant. While the two were at the patch together, the Defendant watered the plants. Lafevers testified that he showed police officers where the marijuana patch was located and told them that he had helped the Defendant water the patch. On cross-examination, Lafevers agreed it was illegal to water marijuana plants, and he conceded he had not been charged for so doing. He said police officers said he would not be charged with an offense if he told the truth while testifying.

Justin Keith Rideout testified that he was friends with the Defendant and that the two had been close for approximately eighteen months. Rideout said that, in June 2006, he and the Defendant discussed growing marijuana. He told investigators that he knew that the Defendant grew marijuana and that Lafevers would know where the marijuana was located. On cross-examination, Rideout said he admitted to officers that he was also growing marijuana, and he showed them where his patch of marijuana was located.

Steve Wilson, an investigator with the Wayne County Sheriff's Department, testified that Justin Rideout and Van Lafevers were separately interviewed by police and both men told officers that the Defendant was growing marijuana. Based upon this information, Investigator Wilson and Agent Vance Jack, with the Tennessee Bureau of Investigations, went to a wooded area close behind 5801 Berry Road, which the investigator described as having a "small, wood-frame[d] house with . . . a metal roof" located on the property. Officers learned that the Defendant lived at the house with his wife and their infant. Investigator Wilson saw and photographed two four-wheelers and one three-wheeler that were parked on the side of the Defendant's home.

2

A couple of days later, officers returned to the property, and went to a field behind the Defendant's house that was mostly flat, and contained a couple of ponds. Investigator Wilson noticed a "couple of very predominant four-wheeler trails" that went between the Defendant's house and field behind his house. The investigator saw that, behind the field, there was a very narrow strip of hardwood timber, which he referred to as "buffer timber." The officers found the marijuana planted among the buffer timber. The officers took aerial photographs of the marijuana discovery. The officers also took multiple photographs of the marijuana plants.

Investigator Wilson, along with Agent Jack and the county sheriff, Sheriff Carl T. Skelton, then "began pulling" the marijuana plants, and each kept track of how many plants they pulled. The three officers added their numbers together, and then verified this count by recounting all the plants, which were placed in one of their vehicles. The officers determined that they seized a total of 526 marijuana plants, which they then transported to the Sheriff's Department. Investigator Wilson sent several samples from these plants to the "TBI" for analysis. The report confirmed that the plants were marijuana.

Investigator Wilson testified that he returned to the same location the next day, and retrieved several other items. He retrieved a fertilizer bag and a clear baggie and also wire that had been used around the patch. On that day, he found an additional twelve plants, for a total of 538 plants seized, each of which he opined was a marijuana plant.

On cross-examination, Investigator Wilson testified that, after the samples were sent to the TBI for testing, the remainder of the plants seized were purposefully destroyed by law enforcement. Investigator Wilson acknowledged that 500 individual plants could not be made out in the photograph and that the number of plants allegedly being grown by the Defendant was a relevant issue to his punishment. He said, however, that the officers went to great lengths to ensure that they had counted the plants accurately. He agreed the plants were destroyed before the Defendant was charged in this case.

Investigator Wilson identified the fencing that he gathered from the crime scene, and he estimated that it was twenty-three feet long. He said that all of the marijuana plants the officers found were inside the fencing. The investigator agreed that the fencing was a common material and that he had found some that was used, apparently, to create a "pen" in the Defendant's yard. Investigator Wilson also found some rolled up fencing material that was not in use next to the Defendant's house. He acknowledged that there are numerous legitimate uses for this type of wire fencing. Investigator Wilson testified he was not certain which four-wheeler made the four-wheeler trails, and he stated that there are multiple legitimate uses for four-wheelers. He did not know whether the Defendant's four-wheelers were "racing" four-wheelers, and he was unsure whether the four-wheeler trails were actually

a practice racing track. He maintained that the trails went from the Defendant's house to a spot located near where the marijuana plants were found.

Investigator Wilson testified that the Defendant did not own the property upon which the marijuana was found, and the property was owned by a pine company. The investigator agreed that there was another home located nearby, but he said the police officers did not take any photographs of that house. He agreed that a man nicknamed "Little Red Bahr" lived in that house when "it [wa]s convenient for him . . . when he [was] not in jail." He said Bahr's trouble with the law mostly involved theft. He did not know whether Bahr was in jail at the time he found the marijuana plants. The investigator said he did not question Bahr about the marijuana plants he found in this case.

Special Agent William H. Stanton, Jr., an agent with the TBI Crime Laboratory, testified that he tested the substance submitted to him by officers in this case and determined it was 3.9 grams of marijuana. He said that when officers found large patches of marijuana plants it was not uncommon for them to send a representative sample of the plants instead of the entire plant seizure. Even if officers sent the entirety of all the plants, he would still have to analyze only a representative sample. On cross-examination, Agent Stanton testified that officers are not precluded from sending all of the plants seized, and they are not required to destroy the sample either. Agent Stanton testified that, after police officers seize a plant, it is placed in a brown paper bag so it does not rot. While inside that bag, it will shrink and lose weight as the water evaporates from the plant. The agent agreed that the amount he analyzed was slightly more than one-eighth of an ounce.

Vance Jack, a Special Agent with the TBI, testified that law enforcement officers first interviewed Rideout, who told them to speak with Lafevers about the Defendant growing marijuana. Agent Jack confirmed he spoke with Lafevers, who led them to the Defendant's marijuana patch. Agent Jack confirmed that there were four-wheeler trails leading between the Defendant's house and a spot close to the marijuana patch. The agent said there was a large patch upon which it appeared multiple four-wheelers had skidded to a halt. From that area, the officers walked through a very narrow line of hardwood trees. After the hardwood trees, were pine trees, and the marijuana plants were located among the pine trees surrounded by wire fencing material. The officers photographed the patch and the trails, and then they took the wire and the plants back to the sheriff's department. The officers looked, but did not find, other foot trails leading toward the patch from other directions.

Agent Jack described how, when the officers pulled the marijuana plants, each officer counted the number of plants that they pulled, and then they added that number together. They then counted the plants when they were compiled in the truck, and ensured that the number matched the original count. Agent Jack said they pulled 526 plants that first day.

When they later returned to the location, they found an additional twelve plants that they originally missed, for a total of 538 plants seized.

Agent Jack testified that a law enforcement helicopter took aerial photographs of the patch and also searched for any other marijuana patches nearby. He opined that the marijuana patch that officers found that day was a "starter bed," intended to be divided to plant several other smaller patches. The agent observed two four-wheelers and one three-wheeler at the Defendant's residence.

The agent said that, after returning to the sheriff's department, the officers examined the plants to ensure that they were all, in fact, marijuana plants. After so doing, they took a sampling of the plants, placed the sampling into a bag, and sent it to the TBI for analysis. They destroyed the remainder of the plants. He said that this comported with the protocol that they had developed for marijuana plant seizures, in part because it was not practical to store large quantities of marijuana plants for extended periods of time.

There is a portion of the transcript missing from this section of the trial. Pursuant to an order by the Tennessee Supreme Court, this Court received the trial court's supplementation to the record. In that supplement, the trial court noted:

> The missing portion of the trial transcript is the balance of the direct testimony of TBI Agent Vance Jack and cross-examination. In reviewing the Court's notes, the Court finds that the balance of the direct testimony of Agent Jack is very brief. After Agent Jack testified that his department followed protocol in taking a sampling of the plants seized for TBI analysis and destroying all remaining plants, he testified that the seized plants measured anywhere from four inches to over four feet to five feet. He stated again that there was only one foot trail leading to the marijuana patch.
>
> After Agent Jack's direct testimony the court recessed for the day, Wednesday, February 7, 2007. The following morning, Thursday, February 8, 2007, there was a jury out where the court reviewed two videos made by law enforcement in the area where the marijuana was found, including trails, and foot path leading to the patch. Defense counsel objected to the introduction of both videos, arguing that they did not accurately depict the area where the marijuana was found, in that the videos were made in the last two days before trial, some six months removed from the offense date of July 28, 2006.
>
> Following the jury out, the cross-examination of Agent Jack was conducted. He testified that Lafevers was helping Jeremy Keeton grow the

marijuana and was in a venture with him. He again testified that no other trails leading to the patch were seen. He testified that the marijuana patch was 50 to 75 yards from the 4 wheeler tracks leading to a foot path to the marijuana. He testified that nothing in the investigation suggested anybody else was involved. Agent Jack stated there was no fencing and that he drove all the way to the entrance to the (foot) path. He again related that 526 plants were loaded in the jeep and a garbage bag was placed over them. He admitted that no pictures of the total plants seized were made by him. He stated that the patch was very thick, and told defense counsel that all evidence pointed to Jeremy Keeton. Agent Jack testified that they walked through the thicket looking for paths and trails and that none were found. He confirmed there was an old logging road toward the western end and that it was very old and covered over.

On re-direct, Agent Jack testified that Rideout told him Jeremy Keeton had some buckets used for growing marijuana, and that he needed to talk to Lafevers. Agent Jack stated that Lafevers' statements to him were consistent with what was uncovered in the investigation. He testified: "The only trail was almost a straight shot connecting the 4-wheeler tracks and the tracks to Jeremy[] Keeton's house.["] The State rested.

Next, the defense called Jeremy Keeton's father, Arlon Keeton. His testimony and the balance of the trial is covered in the trial transcript.

The trial court concluded that, "To the best of the Court's ability, it has supplemented the record with a statement of the missing evidence."

The transcript resumes with testimony from the Defendant's father, Arlan Keeton, testified that the Defendant's son, who was eight years old at the time of trial, had a four-wheeler, as did several other members of their family. They rode the four-wheelers on a trail around the pond in the field behind the Defendant's house. Keeton testified he never saw any marijuana while they were riding on their four wheelers. Keeton said that, at defense counsel's request, he went back to the pine thicket where the marijuana patch had been located. There, he found several trails leading to and from the path. Two of those trails, he said, led to Hayes Branch Road, a road adjacent to the road upon which the Defendant's house sat. Another one of the trails led directly to the front of the Defendant's neighbor's house. He noted that there was no four-wheeler path leading to the location of the marijuana patch.

Keeton testified that he took a video of the trails behind the Defendant's house, and he played that video for the jury. On the video, Keeton is riding a four-wheeler along the

6

trails. Keeton testified he measured the distance between the four-wheeler path and the tree line and determined it was three-tenths of a mile. He also measured the distance between the Defendant's neighbor's house and the marijuana patch and estimated it was between 250 and 300 yards.

On cross-examination, Keeton agreed that he took the video during the week of trial, and he could not say for sure whether the four-wheeler trails looked the same six months before, when the law enforcement officers had found the marijuana patch.

Kristie Right testified that the Defendant was her ex-husband and that the two had a son together. She said that their son rode four-wheelers on a "track" behind the Defendant's house. She said she had walked with their son around the track, and that she had not seen anything unusual.

Based upon this evidence, the jury convicted the Defendant of the lesser included offense of manufacturing marijuana by growing or cultivating not less than 100 nor more than 499 marijuana plants, a Class B felony. *See* T.C.A. § 39-17-417(i)(13) (2010). The trial court sentenced him to twelve years, to be served in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) that he is being denied an "effective appeal" because the record on appeal does not include an official transcript of his cross-examination of a material prosecution witness; (2) the trial court erred when it denied his motion to suppress; (3) the evidence is insufficient to sustain his conviction; and (4) the trial court erred when it sentenced him by not considering a relevant mitigating factor.

### A. Missing Transcript

The Defendant contends that his case should be reversed and dismissed because there is a portion of the transcript missing that cannot be recreated. The missing portion of the transcript contains some of the direct examination and the entirety of the cross-examination of Vance Jack, who was the lead investigator in this case. The Defendant asserts that he is prejudiced by this missing portion of transcript because evidence from that cross-examination is relevant on appeal to the issues of whether his motion to suppress should have been granted and to whether the evidence is sufficient to sustain his conviction. The State counters that the Defendant is not entitled to a new trial on these grounds.

7

There is much documentation in the record about the parties attempting to attain the missing portion of the record. This Court became involved, and we ordered that the portion of the missing transcript be transcribed. It is clear from the record that the parties attempted unsuccessfully to obtain a transcription of the missing record. When they could not, they attempted to create a statement of the evidence, in compliance with Rule 24(c) of Tennessee Rules of Appellate Procedure, but were unsuccessful based in part upon the extended period of time between the time of the trial and the time of the attempted creation of the statement of the evidence. The trial court in this case filed a supplemental order saying that the respective parties had "made diligent and exhaustive efforts to compile and prepare a Statement of the Evidence." These efforts, however, were unsuccessful.

On November 21, 2012, the Tennessee Supreme Court ordered the trial court to use the trial court's notes to supplement the record with a statement of evidence regarding the missing portion of the trial transcript. On January 3, 2013, this Court received the supplemental statement of evidence, which was summarized in the facts section of this opinion. The Defendant made no objection to the trial court's statement of the evidence.

Tennessee Code Annotated section 40-14-307(a), subject to the definitions contained in Tennessee Code Annotated section 40-14-301, provides that in all felony cases in the trial courts of Tennessee:

> A designated reporter shall attend every stage of each criminal case before the court and shall record verbatim, by a method prescribed or approved by the administrative director, all proceedings had in open court and other proceedings as the judge may direct. The reporter shall attach the reporter's official certificate to the records so taken and promptly file them with the clerk of the court, who shall preserve them as a part of the records of the trial.

Accordingly, a defendant has a statutory right to have a verbatim recording and transcript of all proceedings of his trial and sentencing hearing. Rule 24(c) of Tennessee Rules of Appellate Procedure provides for situations in which no transcription of the evidence or the proceedings is available:

> If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's

8

counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal.

After reviewing the statement of evidence submitted by the trial court, we conclude that the Defendant is not entitled to a new trial based upon the portions of the missing transcript, which included the remainder of the direct and the cross-examination of Agent Jack. The trial court's summary sufficiently complies with Tennessee Rule of Appellate Procedure 24(c), and it shows that Agent Jack did not offer any testimony that would entitle the Defendant to a new trial. Further, the Defendant has not alleged, and we fail to see, any way in which his ability to appeal the issues presented herein is hampered by the lack of a transcript of evidence. The Defendant is not entitled to relief on this issue.

### B. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to suppress because the law enforcement officers did not take a video or create a written tally when they counted the marijuana plants, and then, after taking a sampling, they destroyed the evidence. He further asserts that, by its verdict, the jury did not accredit the officers' testimony that they seized more than 500 plants. The State counters that the evidence about the number of plants was properly admissible through the testimony of the officers, who had photographed the plants and who had verified the number of plants by counting them multiple times.

At the motion to suppress hearing, defense counsel informed the trial court that he had filed a motion for discovery, seeking to require the State to produce for his inspection the 500 plants that they seized. The State informed the trial court that three officers were involved in seizing the marijuana plants and that the officers counted the number of plants multiple times, determining that they totaled 538. Each of the three officers, the State said, was available and would testify. Further, the State informed the trial court that the officers had photographed the plants, and the photographs depicted "numerous, numerous marijuana plants growing." The officers then took a sample of some of the plants for testing and destroyed the reminder of the plants.

The trial court stated:

I think it's a matter for the jury to determine what weight to give the officers['] testimony. I mean, I think it's impractical to have to store 538 marijuana plants for trial. Now, you know, I think it comes down to that, [defense counsel], and I'm inclined to find that there's been compliance with the Rules of Discovery there, as much as the State can.

9

Defense counsel implored the trial court to suppress the evidence because the evidence had been destroyed. The trial court declined defense counsel's request, reiterating that "the State's done all they can, in this particular kind of case, with the harvesting of 538 marijuana plants to follow the Rules of Discovery."

Because the Defendant orally moved to suppress the evidence against him, and he raises the issue on appeal based upon the trial court's failure to grant that motion to suppress, we will review it as such on appeal. The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23; *see State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Odom*, 928 S.W.2d at 22-23; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Defendant's motion to suppress was based upon what he alleges is a violation of his constitutional rights. The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides for every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976). In the landmark case of *Brady v. Maryland*, the United States Supreme Court held that the prosecution has a constitutional duty to voluntarily furnish the accused with any exculpatory evidence that pertains to (a) the guilt or innocence of the accused and/or (b) the punishment which may be imposed if the accused is convicted of a criminal offense. *Brady*, 373 U.S. at 83. The Court said in *Brady* that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. Thus, for evidence to fall within the constitutional duty of disclosure, it must be established that the evidence is material to the defense or the sentence that may be imposed if the accused is found guilty.

10

*State v. Ferguson* governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d 912, 917 (Tenn. 1999). The facts presented in *Ferguson* involved a defendant who had been found by police slumped in the driver's seat of a vehicle. *Id.* The arresting officer conducted several field sobriety tasks, which were recorded on videotape, and determined from them and from other observations that the defendant was under the influence of alcohol. *Id.* The videotape of the field sobriety tasks was inadvertently "taped over" before anyone could view it. *Id.* The *Ferguson* Court stated:

> The analysis of both *Brady* and *Agurs* concerns the prosecution's suppression of "plainly exculpatory" evidence. This strikes a sharp contrast to the case under review wherein the existence of the destroyed videotape was known to the defense but where its true nature (exculpatory, inculpatory, or neutral) can never be determined.

After a thorough analysis, our Supreme Court adopted for Tennessee a balancing approach similar to the one espoused by the Supreme Court of Delaware in *Hammond v. State*, 569 A.2d 81, 87 (Del.1989). The Supreme Court explained that the first step in the analysis is determining whether the State had a duty to "preserve" the evidence. *Id.* at 917.

Our Supreme Court stated that the State has a general duty to "preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." *Id.* The Supreme Court noted that the difficulty in determining the extent of the duty to preserve evidence was recognized in *Trombetta* when the United States Supreme Court stated:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

467 U.S. at 488-89. Although the Supreme Court in *Ferguson* stated that the exculpatory nature of evidence had "considerable significance" in determining if the State had a duty to preserve the evidence, the Supreme Court did not expressly adopt the standard for constitutional materiality stated in *Trombetta*. *Ferguson*, 2 S.W.3d at 918. In fact, the Supreme Court's analysis in *Ferguson* did not follow that standard.

The Supreme Court in *Ferguson* did not state that the video recording of the DUI stop at issue in that case had an exculpatory value that was apparent before the recording was

11

destroyed. The Supreme Court stated only that the exculpatory value of the recording was "tenuous"and that the evidence was "probably of marginal exculpatory value." *Id.* at 918. Despite this, the Supreme Court concluded that the State had a duty to preserve the "potentially exculpatory" evidence because it (1) was "at least 'material to the preparation of the defendant's defense,'" (2) "may have" shed light on the defendant's appearance and condition during the DUI field tests, and (3) "might have" caused the jury to have a reasonable doubt as to the defendant's guilt. *Ferguson*, 2 S.W.3d at 918. It seems, therefore, that while the *Ferguson* Court seemed to quote *Trombetta* approvingly, the holding of the *Ferguson* Court makes it clear that did not adopt the *Trombetta* requirement that the evidence must have an exculpatory value that was apparent before it was destroyed.

It is the very fact that the loss of the evidence prevents determining its exculpatory nature that gave rise to *Youngblood* and *Ferguson*. In *State v. Coulter*, 67 S.W.3d 3, 54-55 (Tenn. Crim. App. 2001), a panel of this Court held that the State had no duty to preserve the missing evidence because drawing a conclusion that it had any exculpatory value would be "an exercise in pure speculation." The *Coulter* Court cited *Trombetta* for the proposition that "constitutional materiality" requires that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 54. Another panel of our Court recently discussed this issue and pointed out that panels of this court have determined that evidence should have been preserved without first finding that its exculpatory value was apparent. *State v. Jerome Sidney Barrett*, No. M2010-00444-CCA-R3-CD, 2012 WL 2914119, at *21 (Tenn. Crim. App., at Nashville, July 18, 2012), *perm. app. granted*, No. M2010-00444-SC-R11-CD (Tenn. Sept. 17, 2012). The *Barrett* Court criticized the *Coulter* Court's analysis of *Ferguson*; however, because *Coulter* is a published opinion, the *Barrett* Court was bound to follow it. *Id*. at *22.

Applying the *Coulter* and *Trombetta* cases to the one presently before us, we conclude the State had a duty to preserve the marijuana plants. We conclude that the number of marijuana plants had some apparent exculpatory value so as to require law enforcement officers to at least photograph the marijuana plants, make a written tally, or make a video recording of the plants before they were destroyed. While the Sheriff may have had practical reasons to avoid storing the plants and we are unable to state with certainty how long the plants should have been preserved, we conclude that their destruction two days after the seizure, without a more accurate recording of the count, was not reasonable in light of the absence of other documentation supporting the number of plants seized.

According to *Ferguson*, if the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, a court must turn to a balancing analysis involving consideration of the following factors: "1. The degree of negligence

involved; 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3. The sufficiency of the other evidence used at trial to support the conviction." *Id.* (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options, such as dismissing the charges or providing an appropriate jury instruction. *Id.*

Considering the aforementioned factors, we first examine the degree of negligence involved. *See Ferguson*, 2 S.W.3d at 917. Here, by all accounts, the State destroyed the evidence intentionally without adequately preserving or documenting the evidence.

We next conclude that the destroyed evidence had significant probative value to the offense charged. *See Ferguson*, 2 S.W.3d at 917. The Defendant was charged with growing more than 500 marijuana plants, a Class A felony. *See* T.C.A. § 39-17-417(j)(13)-(A) (2010). The count was close, in that the officers testified that there were 538 plants seized. It is conceivable that some plants may have been split or separated during the pulling process so that they were counted twice. If the plants actually numbered less than 500 plants, the Defendant could only be convicted of a Class B felony. T.C.A. § 39-14-417(i)(13) (2010). Again, because there were no detailed photographs or video recording of the plants after they were pulled and there was no written tally, the plants themselves had significant probative value as defined by *Ferguson*.

Finally, we must consider the sufficiency of the other evidence used at trial to support the conviction the Defendant's conviction. *See Ferguson*, 2 S.W.3d at 917. The Defendant in this case was convicted of the lesser-included offense of growing more than 100 but less than 499 marijuana plants. The other evidence presented at trial, including the photographs taken of the plants while they were in the ground sufficiently supports his conviction.

Therefore, considering the factors enumerated in *Ferguson*, we conclude that, because he was convicted of the lesser-included offense, the Defendant was not denied his right to a fair trial despite the State's failure to preserve the marijuana plants. Any error in admitting testimony of the officers' finding more than 500 plants was harmless. *See* Tenn. R. App. P. 36(b). The Defendant is not entitled to relief on this issue.

## C. Sufficiency of Evidence

The Defendant next contends that the evidence is insufficient to sustain his conviction. He asserts that law enforcement officers "were specifically targeting him" from the outset of their investigation and they neglected to investigate other suspects or evidence. He also

13

calls into question the credibility of some of the witnesses who testified. The State counters that the evidence presented supports the jury's verdict.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view

14

of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Our Supreme Court recently held that, "when reviewing a convicted defendant's claim that the evidence is not sufficient to support his or her conviction, the review must be undertaken with respect to the crime of which the defendant was convicted, not the crime with which he was charged." *State v. Parker*, 350 S.W.3d 883, 907 (Tenn. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 n.16, 99 (1979) (stating that the standard of review "must be applied with explicit reference to the substantive elements of the criminal offense [challenged] as defined by state law")). Further, the Court stated that, "the proof may support conviction of a different, even a 'greater,' offense does not obviate the constitutional requirement that the proof support each and every element of the offense for which the defendant was actually convicted." *Id.* Accordingly, to sustain a conviction of a lesser-included offense, the proof must be sufficient to support each and every element of the offense for which the defendant was convicted. *Id.* at 909 (overruling *State v. Mellons*, 557 S.W.2d 497 (Tenn. 1977).

In this case, the Defendant was convicted of manufacturing a controlled substance pursuant to Tennessee Code Annotated section 39-17-417 (a)(1) by growing or cultivating not less than 100 nor more than 499 marijuana plants. *See* T.C.A. § 39-17-417(i)(13) (2010).

Our standard of review, as stated previously, is viewing the evidence in the light most favorable to the State. Our concern is not what evidence was presented that could have inferred guilt onto another suspect, but, rather, if there was sufficient evidence upon which a rational jury could have found the Defendant guilty. The evidence, viewed in this light, proved that the Defendant enlisted the aid of his friend, Lafevers, to water a marijuana patch located in a field behind his house. The two rode the Defendant's four-wheelers to this patch on multiple occasions, and watered the plants together. The patch was surrounded by wire that Lafevers had provided to the Defendant upon the Defendant's request. The Defendant discussed growing marijuana with another of his friends, Rideout. When interviewed by police, both Lafevers and Rideout told officers that the Defendant grew marijuana, and Lafevers brought them to the marijuana patch behind the Defendant's house. There, police officers found a well ridden four-wheeler trail that went between an area near the marijuana patch and the Defendant's home. They also found three four-wheelers parked near the Defendant's house.

15

Officers photographed and counted the marijuana plants. Those plants totaled 538. They took a sampling of the plants, and TBI laboratory testing confirmed that the plants were marijuana. By its verdict, the jury after reviewing the pictures and evidence, determined that the evidence proved beyond a reasonable doubt that there were at least 100 but less than 499 marijuana plants seized. This evidence sufficiently supports the jury's verdict. The Defendant is not entitled to relief on this issue.

### D. Sentencing

The Defendant contends that the trial court erred when it sentenced him to the maximum sentence within its range and failed to consider one mitigating factor, that his conduct neither caused nor threatened serious bodily injury. He contends that there was no evidence presented that growing marijuana either caused or threatened bodily injury and that, therefore, the trial court should have given this mitigating factor some weight.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2010). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2010); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

The trial court stated that it considered the pre-sentence report, notices filed by the State, testimony at trial and the sentencing hearing, stipulations made by the parties as to the Defendant's criminal history, the facts and circumstances of the offenses, and all other factors listed in Tennessee Code Annotated section 40-35-210 in determining the Defendant's sentence in this case. The trial court found two enhancement factors applied to the Defendant's sentence, (1) the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; and (2) the defendant was a leader in the commission of an offense involving two . . . or more

16

criminal actors.  *See* T.C.A. § 40-35-114(1) and (2) (2010).  In so finding, the trial court stated:

> Considering the prior record which comes into the record here undisputed today, [the Defendant] starts his adult criminal behavior at age eighteen.  He stands before the Court today with five felony convictions including marijuana, evading arrest, theft, and reckless endangerment, two convictions for reckless endangerment.  The Court notes that a deadly weapon was involved in Case Number 12696 in Wayne County Circuit Court.  The Court also recognizes that the evading arrest becomes a class D conviction under Case 12594, under the risk of death.  He also has on his record ten misdemeanor convictions ranging from assaults, theft, vandalisms, disorderly conduct.

The trial court also noted the times that the Defendant had been incarcerated and that he was facing murder charges in another case, along with charges of multiple aggravated assaults, reckless endangerment, and the sale of a Schedule II controlled substances.  The trial court noted that it gave only "slight weight" to enhancement factor (2) and then found no mitigating factors applied.  In rejecting mitigating factor (1), that the Defendant's conduct neither caused nor threatened serious bodily injury, the trial court stated:

> Insofar as [counsel] is pushing for . . . [enhancement factor] number one . . . do we discount that this is marijuana?  It's illegal.  It's a controlled substance under our law, as much as methamphetamine is a problem in Wayne County, as well as cocaine and any other controlled substance that's listed as illegal under our law.  And the Court finds that she will not consider that advisory factor, finding that drugs, regardless of what they're controlled substances, lead to disaster, deterioration, destruction, and even death.

Based upon these findings, the trial court enhanced the Defendant's sentence to the maximum within the range.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence.  Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles.  T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).  The Defendant in this case is a Range I offender, convicted of a Class B felony.  *See* T.C.A. § 40-35-112(a)(1) (2010).  Therefore his applicable sentencing range is between eight and twelve years.  *See* T.C.A. § 40-35-112(a)(2) (2010).

17

The Tennessee Code allows a sentencing court to consider the following enhancement factors, as relevant to this case, when determining whether to enhance a defendant's sentence: "(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" and "(2) The defendant was a leader in the commission of an offense involving two . . . or more criminal actors; . . . ." T.C.A. § 40-35-114(1), and (2) (2010). If an enhancement factor is not already an essential element of the offense and is appropriate for the offense, then a court may consider the enhancement factor in its length of sentence determination. T.C.A. § 40-35-114 (2010). In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e) (2010). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8-9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2010); *Carter*, 254 S.W.3d at 343.

The Defendant in this case does not argue that the trial court improperly considered the two enhancement factors that it applied to his sentence. Further, we conclude the evidence supports the trial court's finding that those factors applied. On appeal, the Defendant contends only that the trial court failed to consider one applicable mitigating factor, that his crime neither caused nor threatened serious bodily injury. Tennessee Code Annotated section 40-35-113 contains a non-exclusive list of mitigating factors that a trial court may apply to a defendant's sentence "if appropriate for the offense." T.C.A. § 40-35-113 (2010). The list includes that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury." T.C.A. § 40-35-113(1) (2010).

Mitigating factor (1) applies where the defendant's criminal conduct neither caused nor threatened serious bodily injury. *See* T.C.A. § 40-35-113(1) (2010). Our Supreme Court has emphasized factor (1)'s application "focuses not on the circumstances of the crime committed by a defendant as do many of the other mitigating and enhanc[ement] factors. Rather, this factor focuses upon the defendant's conduct in committing the crime." *See State v. Ross*, 49 S.W.3d 833 (Tenn. 2001). For example, the defendant in *Ross* was convicted of possession of cocaine based on his constructive possession of cocaine that was located within his hotel room and that he did not attempt to sell. The trial court refused to apply mitigating factor (1), reasoning that cocaine, an inherently dangerous substance, necessarily threatened serious bodily harm. *Id.* at 848. Our Supreme Court, however, held that factor (1) did apply because the defendant did nothing with the cocaine to threaten serious bodily injury, such as

attempt to sell the cocaine. *Id.* The Supreme Court emphasized in *Ross* that mitigating factor (1) applies where the threat, if any, of serious bodily injury is "more conceptual than real." *Id.* In this case, the trial court considered that the Defendant's conduct pertaining to the marijuana in this case was connected to a companion case for murder, aggravated assault, reckless endangerment, and sale of a Scheduled II controlled substance. While, as the trial court noted, the Defendant was "innocent until proven guilty," these facts still support the trial court's finding that the threat of serious bodily injury in this case was not "more conceptual than real."

Further, we conclude that, even if the trial court should have applied mitigating factor (1), it should be afforded little, if any, weight. *See State v. William Waylon Jackson*, No. 02C01-9707-CC-00267, 1998 WL 285555, at *4 (Tenn. Crim. App., at Jackson, June 3, 1998), *perm. app. denied* (Tenn. Feb. 1, 1999). Accordingly, we decline to modify the Defendant's sentence. He is not entitled to relief on this issue.

### III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgment and the Defendant's sentence.

_____
ROBERT W. WEDEMEYER, JUDGE